IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| K-V PHARMACEUTICAL COMPANY, and THER-RX CORPORATION, | * * * | |
| | * | CIVIL ACTION |
| Plaintiffs, | * | 1:12-CV-02491-CAP |
| | * | |
| v. | * | |
| | * | |
| DAVID A. COOK, in his Official Capacity as Commissioner of the Georgia Department of Community Health, and | * * * * | |
| | * | |
| JERRY DUBBERLY, M.D., in his official capacity as division chief of the Medicaid Division of the Georgia Department of Community Health, | * * * * | |
| | * | |
| Defendants. | * | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**COME NOW** David A. Cook ("Cook"), Commissioner of the Georgia Department of Community Health ("DCH") and Jerry Dubberly ("Dubberly," collectively with Cook, the "Department"), division chief of the Medicaid Division of DCH, by and through their counsel of record, and files this their *Memorandum of Law in Support of their Motion for Summary Judgment* and shows this Court as follows:

## I.   INTRODUCTION

While Plaintiffs cannot show the Department violated the Medicaid Act, this case is really about whether or not Plaintiffs can enforce their exclusivity rights under the Food, Drug, and Cosmetic Act, 21 USC § 301 *et seq*. ("FDCA") to preclude the use of compounded hydroxyprogesterone caproate ("17P").  The FDCA provides a clear answer.  Plaintiffs do not have this authority no matter how they may style their case.

The Department provides coverage to those who wish to obtain Makena. However, it does not force a doctor to prescribe it.  Just like the Centers for Medicare & Medicaid Services ("CMS") indicated, 17P can be reimbursed as a pharmacy benefit. [Dkt. 2-39].

Plaintiffs take the aforementioned statement and assert here that the Department has no authority to prefer 17P.  At the same time in the United States District Court for the District of Columbia ("D.C. Court"), they assert that on "March 30, 2011, within hours of the release of the [Food and Drug Administration's ("FDA")] statement, [CMS]…issued its own statement, which effectively informed States and Medicaid payers that they can pay for non-customized compounded 17P despite the availability of FDA-approved Makena." [Dkt. 14-2 at 8].

The D.C. Court concluded Plaintiffs cannot force the FDA to withdraw a statement that favors 17P.  Likewise, this Court cannot allow Plaintiffs to force a State Medicaid agency to stop reimbursing for 17P.

## II.  STATEMENT OF FACTS

This case is about a drug called hydroxyprogesterone caproate. Hydroxyprogesterone caproate was originally approved in 1956 and marketed as Delalutin.  [Dkt. 14-4 at 9].  In 2000, the Delalutin rights holder notified the FDA that it was no longer being marketed and requested the FDA withdraw its approval. [*Id*.].  After the withdrawal, 17P was only available through compounding pharmacies.  [*Id*. at 11].  Drug compounding is a process by which a pharmacist or doctor combines, mixes, or alters ingredients to create a medication tailored to the needs of an individual patient.  *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 360-61 (2002).

Plaintiffs are K-V Pharmaceutical Company and its wholly-owned subsidiary, Ther-Rx who market and sell Makena (the brand name product of hydroxyprogesterone caproate).  *See* [Dkt. 2-2 at 1].  Makena was approved by the FDA in February 2011.  [Dkt. 1 at 16].  While 17P was available for $10-20 per dose, the initial list price for Makena was $1,500.  [Dkt. 2-31 at 7].  Makena is administered by weekly injection with an average course of treatment of twenty

(20) doses.  [Dkt. 1-4 at 10].  Thus, the initial list price for a course of Makena was

up to $30,000, while the compound would cost up to $400. [1]

After Makena's approval, Plaintiffs sent a letter to compounding pharmacies

asserting the compounding pharmacies could no longer produce 17P or they would

face FDA enforcement.  [Dkt. 1-3].  The FDA responded to Plaintiffs' assertion

through its March 30, 2011 statement.

> FDA understands that the manufacturer of Makena, KV
> Pharmaceuticals, has sent letters to pharmacists indicating that FDA
> will no longer exercise enforcement discretion with regard to
> compounded versions of Makena.  This is not correct.
>
> In order to support access to this important drug, at this time and
> under this unique situation, FDA does not intend to take enforcement
> action against pharmacies that compound [17P]…unless the
> compounded products are unsafe, of substandard quality or are not
> being compounded in accordance with appropriate standards for
> compounding sterile products.

[*Id.*].  The FDA statement further provides that the FDA "did not identify any

major safety problems" with the compounded drug.  [*Id.*].  Moreover, "[T]here is

no evidence that the FDA-approved product is safer or more effective than

compounded 17P."  [Dkt.14-2 at 13 (citing B. Sibai, et al., *Pregnancy Outcomes of*

*Women Receiving Compounded 17 α-Hydroxyprogesterone Caproate for*

*Prophylactic Prevention of Preterm Birth 2004 to 2011*, Am. J. of Perinatology

---

[1] After a public outcry, Plaintiffs reduced the price.  [Dkt. 2-31 at 7-8].

(2012), available at https://www.thieme-connect.de/DOI/DOI?10.1055/s-0032-1311979.)].  *See also* [Dkt. 15-2 at 4].

CMS cited to the FDA Statement of March 30, 2011 and advised the FDA continues to allow compounding of 17P.  [Dkt. 2-39].

> Therefore, we would like States to be aware that they can choose to pay for the extemporaneously compounded hydroxyprogesterone caproate as an active pharmaceutical ingredient (API) and this can be covered under the "medical supplies, equipment and appliances suitable for use in the home" portion of home health.

[*Id.*].  In an updated statement, it again advised "States may, under appropriate circumstances, cover APIs as incident to another service category or, as a pharmacy service, if such coverage is consistent with the State plan."  [Dkt. 2-42]. Plaintiffs themselves note the "CMS policy permit[s] Medicaid program reimbursement of compounded products." [Plaintiffs' 2012 Annual Report at 25].[2]

The Department covers both 17P and Makena under its outpatient pharmacy

---

[2] The Department notes Plaintiffs' representative confirmed that its filing was accurate.
Q: Do you have reason to doubt this 10-K?
A: I wouldn't say that….
Q: Do you believe this 10-K is an accurate description of the events that happened at that time?
A: I have no reason to believe it's not.
Q: And would you assert that K-V's filings with the Securities and Exchange Commission are truthful and accurate?
A: I certainly believe they are, yes.
[Goedeke Depo. at 111]

program subject to prior authorization.  [Dkt. 1 at 7, 14; 14-4 at 4, 6].  The

Department's policy states that due "to prior success with [17P] coupled with the

narrow indications of Makena, the Medicaid Division will require documentation

of medical necessity for Makena over [17P]."  [Dkt. 1-7].  This means that a

physician requesting Makena must show that the member meets medical criteria

for Makena (is between the ages of 16-43 with a history of at least one pre-term

birth) and that she either is unable to obtain or is not able to use compounded 17P.

*See* [Dkt. 1-8].  There must also be a confirmed pregnancy with one fetus with a

gestational age between 16 weeks and 20 weeks, 6 days.  *See id.*  As Ms. Wiant

explained, so long as the physician provides some documentation for the need for

Makena, his request would be approved.  [Wiant Depo. at 99].

Since Makena became available and prior to July 1, 2012, the Department's

fee for service program had only received fifteen (15) requests for prior approval.

[Dkt. 14-4 at 4, 6].  As of July 1, 2012, the Department had only denied three (3)

requests because the physician did not provide any clinical rationale precluding the

use of the compound, while the Department approved four (4) prior authorizations.

[*Id.* at 6].[3]

---

[3] Of the remaining requests, the Department denied three because the medication
was to be administered in the physician's office so it had to be billed through the

Prior to this action, Plaintiffs filed a Complaint for Declaratory and Injunctive Relief against the FDA in the D.C. Court on July 5, 2012. *See* [Dkt. 14-2]. In that action, Plaintiffs wanted the D.C. Court to order the FDA to permanently "withdraw" its March 30, 2011 and June 15, 2012 statements. [Dkt. 14-2 at 42]. Plaintiffs alleged the FDA "violat[ed] the Administrative Procedure Act ("APA") and several provisions of the [FDCA] by failing to take action against pharmacies that compound the drug and thereby creating a cheaper alternative [to Makena] for doctors to prescribe. *K-V Pharm. Co. v. United States Food & Drug Admin.*, 889 F. Supp. 2d, 119, 123 (D.D.C. 2013).[4] The D.C. Court dismissed Plaintiffs' claims finding they did not state a claim for relief as the FDA's actions were within its discretion. *See id.*

On July 18, 2012, Plaintiffs served on the Department their complaint and motion for injunction in this action. [Dkt. 1; 2]. Plaintiffs seek certain injunctive and declaratory relief, including enjoining the Department from implementing its Makena prior authorization policy and prohibiting the Department from "covering and paying" for 17P except where there is specific medical need for the "compounded variation rather than Makena." [Dkt. 1-47-48]. The Department

---

physician injectable drug list.   [*Id.* at ¶ 9]. For the other five denials, the physician sought an unapproved use of Makena. [*Id.*].

[4] The Department notes Plaintiffs are appealing the decision.

responded to the motion and filed a motion to stay.  [Dkt. 14; 15].

In support of its action, Plaintiffs allege the Department's policy violates federal law as well as recently issued statements by the FDA and CMS regarding coverage for FDA-approved drugs, including Makena.  *See* [Dkt. 2-2 at 3-5].  It advises the Department's actions are "contrary to the best interests of Medicaid beneficiaries."  [Dkt. 1 at 2].

The Complaint advises that the FDA is concerned about the safety of 17P and in support thereof cites to the FDA's June 15, 2012 statement ("FDA June Statement") and the FDA's questions and answers statement ("FDA FAQ") on the compounded drug.  [Dkt. 1 at 5-7].  Of course, the FDA June Statement provides that beginning "many years before Makena was approved, a version of the active ingredient of Makena has been available to patients whose physicians requested the drug."  [Dkt. 1-2 at 1].  Likewise, the FDA FAQ provides that the FDA did not "identify a major safety issue."  [Dkt. 1-1 at 2].  Also, "pharmacies may compound the compounded drug so long as they do not 'exceed the scope of traditional pharmacy compounding.'"  [Dkt. 1-1 at 1].

As further support of Plaintiffs' position on safety, the Complaint cites the Congressional testimony of the Commissioner of the FDA to assert that is important to "have an FDA-approved drug to prevent pre-term pregnancy."  [Dkt.

1 at 16].  During the same colloquy, United States Senator Sherrod Brown asked,

> What can the FDA do to stop manufacturers from exploiting this existing approval process even though KV has admitted that the price increase doesn't derive from R&D or from production costs…they didn't do the R&D, in fact taxpayers did most of the R&D here.  So taxpayers, you know, in the end got for, they got a good drug but <u>it looks a lot like blackmail to me</u>….

[Dkt. 1-4 at 11(emphasis supplied); 1-3].  Then at the end of the colloquy, "[t]his company acted, I guess you can't say criminally but, you know, immorally and any other string of adverbs you might want to choose."  [Dkt. 1-4 at 12].

This Court entered the preliminary injunction and denied the motion for stay.  [Dkt. 30].  In lieu of an answer, the Department filed a motion to dismiss where it asserted Plaintiffs failed to state a claim for relief and do not have standing to bring this action.  [Dkt. 25].  In particular, the Supremacy Clause of the United States Constitution does not give Plaintiffs a cause of action.  [*Id.* at 21].

In response, Plaintiffs asserted they have standing and advised "KV does not bring this suit pursuant to § 1983.  Rather, it asserts that [the Department's] unlawful policies are barred by the Supremacy Clause."  [Dkt. 34 at 15].  That is, Plaintiffs assert the Supremacy Clause gives them a private right of action.  *See* [*Id.* at 16].

On November 9, 2012, this Court denied the Department's motion to dismiss.  [Dkt. 45].  The Department filed a motion for reconsideration or in the

alternative interlocutory appeal. [Dkt. 47].   The Department then filed its answer

on November 21, 2012. [Dkt. 48].  On February 7, 2013, this Court denied the

motion for reconsideration or interlocutory appeal. [Dkt. 53].  Pursuant to this

Court's order of March 18, 2013, discovery ended on April 2, 2013.  [Dkt. 65].

### III.   STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers

to interrogatories, and admissions on file, together with affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Manor*

*Healthcare Corp. v. Lomelo*, 929 F.2d 633, 636 (11th Cir. 1991).  The initial

burden rests on the moving party to point out the absence of any genuine issue of

material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the

moving party does not have the burden of proof, that party carries its initial burden

either by presenting evidence negating an essential element of the nonmoving

party's claim or demonstrating that the nonmoving party cannot meet its burden at

trial. *See id.* at 323.  *See also Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir.

1987).  Once satisfied, the burden shifts to the opponent to demonstrate through

production of probative evidence that an issue of fact remains to be tried. *See*

*Celotex Corp.*, 477 U.S. at 324.  A trial court can only consider admissible

evidence in ruling on a motion for summary judgment. *See Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996). "The moving party is entitled to 'judgment as a matter of law' when the nonmoving party fails to make a sufficient showing of an essential element of the case to which the nonmoving party has the burden of proof." *Everett*, 833 F.2d at 1510 (citing *Celotex Corp.*, 477 U.S. 317 (1986)).

> A district court may grant injunctive relief only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) (citing *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam)). The standard for a permanent injunction is the same except Plaintiffs must show actual success on the merits. *Id.* (citations omitted). Here, there is no genuine issue as to any material fact and the Department is entitled to judgment as a matter of law.

## IV.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Plaintiffs Are Seeking To Enforce The FDCA.

This lawsuit is another clever attempt by a drug manufacturer to enforce the FDCA. Plaintiffs clearly spell out their reliance on the FDCA as they assert the

Department

> is paying for violations of the <u>Federal Food, Drug and Cosmetic Act's drug</u>
> <u>approval requirement</u> (21 U.S.C. 355(a)), and its actions are contrary to the
> best interests of Medicaid beneficiaries in Georgia, in violation of 42 U.S.C.
> §§ 1396r-8 and 1396 a(a)(10).  These unlawful actions by Georgia, and
> similar unlawful actions by other states have placed KV on the verge of
> financial failure.

[Dkt. 1 at 2 (emphasis added)].  "This denial of medical care to the poor and

vulnerable is not only unlawful, but is in defiance of statements recently issued by

the two lead federal agencies – FDA and [CMS] – regarding states' legal

obligation to cover the FDA-approved drug and to <u>stop supporting the unlawful</u>

<u>preparation of compounded copies</u>."  *Id*. at 1 (emphasis added). "'Covered

outpatient drugs' are those drugs…that have been approved for safety and

effectiveness as a prescription drug under the [FDCA]…Compounded

preparations, which are not FDA-approved, are not 'covered outpatient drugs.'"

*Id*. at 13.  Plaintiffs have

> invested or committed over a quarter of a billion dollars to acquiring
> Makena, obtaining approval for it, and bringing it to market as an
> 'orphan drug' that would enjoy seven years of market exclusivity
> under the Orphan Drug Act.  Makena is [Plaintiffs'] most significant
> product, and was expected to account for the vast majority of
> [Plaintiffs'] projected revenue during the remaining Makena
> exclusivity period.

*Id*. at 38.  "No legitimate prior authorization policy, other than to ensure that the

clinical criteria for use are met, could lawfully be conducted in these

12

circumstances, given that Makena is the only FDA-approved drug for its approved indication." *Id.* at 41. "FDA publicly stated that, 'to support access' to [17P] injection, it was <u>not going to apply to compounded versions of 17P its longstanding enforcement policy regarding compounding</u> when an FDA-approved drug is available in the market. Under that policy, FDA typically <u>clears the market</u> place to remove compounded copies of an FDA-approved drug." *Id.* at 17 (emphasis added).

Moreover, as this Court noted in its order on the preliminary injunction, "[b]ecause the court finds that the FDA drug approval process means something, the defendants' current policy favoring [17P] over Makena is the opposite of what it should be." However, only the FDA can bring suit to enforce its authority.

Section 337(a) of the FDCA provides "[a]ll such proceedings for the enforcement, or to restrain violations, of this Act [21 USCS §§ 301 et seq.] shall be by and in the name of the United States." 21 U.S.C. § 337. It is well settled that no private right of action exists to enforce the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487 (1996); *Ellis v. C. R. Bard*, 311 F.3d 1272, 1284 n.10 (11th Cir. 2002).

> Moreover, "[t]he absence of a private right of action to enforce the FDCA means not only is a private party precluded from bringing suit to enforce the provisions of the FDCA, they also 'may not use other federal statutes or state unfair competition laws as a vehicle to bring a

private cause of action that is based on violations of the FDCA.'"
Loreto, 737 F.Supp.2d at 919 (quoting In re Epogen & Aranesp Off-
Label Mktg. & Sales Practices Litig.., 590 F. Supp. 2d 1282, 1290-91
(C.D. Cal. 2008)). Thus, "a private litigant cannot bring a state-law
claim against a defendant when the state-law claim is in substance
(even if not in form) a claim for violating the FDCA — that is, when
the state claim would not exist if the FDCA did not exist." Riley v.
Cordis Corp., 625 F.Supp.2d 769, 777 (D. Minn. 2009).

Reeves v. PharmaJet, Inc., 846 F. Supp. 2d 791, 797 (N.D. Ohio 2012).  In a case

about a drug manufacturer promoting the off-label use of its FDA approved drug,

various entities brought suit alleging the company "engaged in a scheme to boost

profits by unlawfully promoting the intravenous administration of [Epogen &

Aranesp] to treat anemia in kidney dialysis patients."  See In re: Epogen &

Aranesp Off-Label & Sales Practices Litigation, 590 F. Supp. 2d 1282, 1285 (C.D.

Cal. 2008).  The court conducted its analysis by first finding the "[d]issemination

of an advertisement not in compliance with FDA regulations causes a drug to be

'misbranded' in violation of the FDCA." Id. at 1288.  It then found that while

Plaintiffs have avoided explicit references to 'misbranding' in their
Complaint, their RICO and state law claims are primarily based on
allegations that Defendants promoted [Epogen & Aranesp] for off-
label uses.  For example, Plaintiffs allege that Defendants "engaged in
a massive scheme to defraud Plaintiffs and the Class . . . and
substantially increase sales of [EPO] by unlawfully promoting the use
of these drugs for unsafe purposes and at dangerous doses not
specified on the drugs' [FDA-]approved labels (i.e., off label
promotion)." Compl. P 3. The Complaint is rife with similar
references to illegal off-label promotion, see, e.g., Compl. PP 5, 7, 14,
54, 71, 80, 85, 119, 123, and Plaintiffs seek to enjoin the illegal

promotion.

*Id.* at 1288-89.  Thus, the court found the "lawsuit largely constitutes an attempt to shoehorn allegations that Defendants have engaged in off-label promotion in violation of the FDCA into RICO and state consumer fraud causes of action." *Id.* at 1290.  Such action was barred by the FDCA.

Likewise in this action, Plaintiffs are seeking to use the Medicaid Act to enforce their exclusivity period since the FDA will not take such action.  Plaintiffs are seeking to "Prohibit [the Department] from covering and paying for [17P] except in limited circumstances." *Id.* at 44-45.  That is, the "crux of Plaintiff's claim is that Defendant violated FDA regulations and that purported violation forms the basis of Plaintiff's complaint. As such, the claim is barred by Section 337(a) and the well established case law interpreting it." *Reeves v. PharmaJet, Inc.*, 846 F. Supp. 2d at 797.  The FDA is the only entity that can enforce the FDCA against 17P.[5]

B.        **Plaintiffs Are Attempting To Take Away The FDA's Enforcement Discretion.**

To that end, Plaintiffs seek to take away the enforcement discretion of the

_____

[5]The Department incorporates herein its arguments from previous pleadings in this matter that Plaintiffs do not have standing and they do not have a cause of action under the Supremacy Clause of the United States Constitution. [Dkt. 25, 40, 46, 47].  Given that this Court has already ruled upon this argument, the Department is again raising this issue to preserve it for appeal, if necessary. [Dkt. 45, 53].

FDA and utilize it themselves.  The United States Supreme Court already reviewed

a similar situation where a group of prison inmates subject to capital punishment

sought to force the FDA to enforce the FDCA against various state governments

alleging their use of drugs for lethal injection violated the FDCA.  *Heckler v.*

*Chaney*, 470 U.S. 821, 823 (1985).  As the FDA refused to enforce the FDCA, the

inmates brought suit, arguing the use of the drugs for execution was a new use and

as such the drugs would need to comply with the approval requirements of the

FDCA.  *Id.*  They further argued the use of the drugs for execution was an

unapproved use of an approved drug, which constituted misbranding.  *Id.*  The

United States Supreme Court held an agency's decision to not take enforcement

action is unreviewable unless Congress "has indicated an intent to circumscribe

agency enforcement discretion."  *Id.* at 834.

> [A]n agency decision not to enforce often involves a complicated
> balancing of a number of factors which are peculiarly within its
> expertise.  Thus, the agency must not only assess whether a violation
> has occurred, but whether agency resources are best spent on this
> violation or another, whether the agency is likely to succeed if it acts,
> whether the particular enforcement action requested best fits the
> agency's overall policies, and, indeed, whether the agency has enough
> resources to undertake the action at all...The agency is far better
> equipped than the courts to deal with the many variables involved in
> the proper ordering of its priorities...Finally, we recognize that an
> agency's refusal to institute proceedings share to some extent the
> characteristics of the decision of a prosecutor in the Executive Branch
> not to indict – a decision which has long been regarded as the special
> province of the Executive Branch.

*Id.* at 831-32.  The Supreme Court then found the FDCA did not provide any

indication that Congress intended to circumscribe the FDA's discretion.

> Likewise, the D.C. Court found
>
> Plaintiffs claimed injury is the <u>loss of their market exclusivity,</u> and the
> attendant profits due to unlawful competition from non-customized
> [17P].  Pls. Opp. At 9.  To remedy this injury, plaintiffs ask the Court
> to order FDA to take enforcement actions against the unlawful
> compounders...<u>Medicaid agencies, in particular, would have to change
> their policies</u> as to Makena if the supply of [17P] were to diminish.

*K-V Pharm.Co.*, 784 F. Supp. 2d at 130(emphasis added).  The D.C. Court then

found Plaintiffs had no valid cause of action and dismissed the Complaint.  Just

like the Supreme Court and the D.C. Court, this Court must hold Plaintiffs do not

have the ability to limit the FDA's discretion.

### C.   Plaintiffs Failed To Show The Department Violated The Medicaid Act.

The Department did not violate any federal law.[6]  Plaintiffs have allegedly

brought the instant action under the Supremacy Clause of the United States

Constitution asserting the Department violated the Medicaid Act, 42 U.S.C. § 1396

---

[6]The Department further notes it is not clear Plaintiffs can even obtain equitable
relief because of the doctrine of unclean hands.  "The doctrine of "unclean hands"
is an equitable test that is used by courts in deciding equitable fate."  *United States
v. Howell*, 425 F.3d 971, 974 (11th Cir. 2005).  As Senator Brown found, Plaintiffs
exploited the FDA approval process to set an artificially high price.  *See* [Dkt. 1-4
at 11].  As the FDA found, Plaintiffs sent false information to compounding
pharmacies that the FDA had to address.  *See* [Dkt.1-3].

*et seq. See* [Dkt. 1]. Plaintiffs do not allege the Department's regulations nor any state law is in conflict with a federal law. They allege the Department's "prior authorization policy" violates section 1396r-8(a) and 1396a(a)(19) of the Medicaid Act. [Dkt. 1 at 41].

However, there is no preemption in this matter. Where "coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." *Pharmaceutical Researcher & Mfrs of America v. Meadows*, 304 F.3d 1197, 1206 (11th Cir. 2002) (citations omitted). Given that states are required to design and implement their own Medicaid program, there can be no express or field preemption. *Id.* The only possible category in analyzing the prior authorization requirement is the implied conflict preemption. *Id.*

Implied conflict preemption occurs when one cannot comply with both federal and state law or when the state law is an obstacle to the objectives and purposes of the federal law. *Id.* Here, Plaintiffs are arguing that the Department's prior authorization policy violates federal law because it acts as an impermissible formulary, which excludes Makena. [Dkt. 1 at 4]. But federal law expressly permits the Department to institute a prior authorization program and the Department's program includes Makena as one of the drugs for which prior

authorization is required as well as 17P.  *See* 42 U.S.C. § 1396r-8(d)(1)(A); [Dkt. 1-8; 15-2 at 6].  The only federal requirements for a state's prior authorization program are that it (1) provides for "response by telephone or other telecommunication device within 24 hours of a request" and (2) "provides for the dispensing of at least 72-hour supply of a covered outpatient prescription drug in an emergency situation."  42 U.S.C. § 1396r-8(d)(5).  *See also Pharm. Research & Mfrs. of Am.v. Walsh*, 538 U.S. 644, 653 (2003).  There is no dispute that the Department's prior authorization program meets those two requirements.

To the extent Plaintiffs contend the Department's prior authorization program is a thinly-veiled formulary, it has been established that "a prior authorization program established under paragraph (5) is not a formulary subject to the requirements of [§ 1396r-8(d)(4)]."  *Walsh*, 538 U.S. at 653.  *See also Pharm. Research & Mfrs. of Am. v. Thompson*, 259 F. Supp. 2d 39, 63 (D.D.C. 2003).  In *Thompson*, the court held that PhRMA's "illegal formulary" claim must fail because states were specifically permitted to require prior authorization and the only express limitations on prior authorization in § 1396r-8(d) were the 24/72 hour requirements of § 1396r-8(d)(5)).  *Id.  See also Meadows*, 304 F.3d. at 1207-08.

Here, there is no dispute that Makena is already encompassed by the Department's formulary.  [Dkt. 1 at 14 (the Department "has recognized that

Makena is a 'covered benefit under the Medicaid Fee-for-Service pharmacy

program'")]. 42 U.S.C. § 1396r-8(d)(1)(A)

> permits a state Medicaid plan to "subject to prior authorization *any*
> covered outpatient drug." (emphasis added).  Further, the text of the
> Medicaid statute contains only two specific limitations on prior
> authorization: a response within 24 hours and the availability of an
> emergency 72 hour supply of the drug. Cf. Concannon, 249 F.3d at 76
> (stating that the only two requirements for a prior authorization
> program under § 1396r-8(d)(5) are "the 24-hour response and the 72-
> hour drug-supply requirements"). Because the Florida law satisfies
> both of these requirements, see Fla. Stat. § 409.912(37)(a)1,
> compliance with both federal and state law is certainly possible.

*Meadows*, 304 F.3d at 1207.  Since Makena is already in the formulary, Plaintiffs

cannot state a valid claim for relief.

Plaintiffs are also asserting the Department's policies are not in the best

interest of Medicaid recipients.  Plaintiffs contend that the Department's prior

authorization policy violates section 1396a(a)(19), which requires state plans to

provide care and services in the best interests of the recipients.  [Dkt. 1 at 43].

However, Plaintiffs cannot bring a "best interests" claim on behalf of Medicaid

recipients.

At first blush it may seem Plaintiffs are concerned with the best interests of

Medicaid recipients; Plaintiffs act only in their own financial best interests.  *Id.* at

38 (Plaintiffs'"survival as a going concern is now dependent on Makena's success

in the marketplace.")].  As noted in *Thompson,* 259 F. Supp. 2d at 57,

> As is plain from the language of § 1396a(a)(19), the "best interests" requirement is intended to protect the administration of the Medicaid program and the interests of Medicaid recipients with respect to their health care.  There is certainly some question as to whether PhRMA has standing to raise a "best interests" claim under § 1396a(a)(19). Although as noted above, the interests of drug manufacturers may be aligned with those of beneficiaries in the context of state attempts to exclude drugs from a formulary under § 1396r-8(d)(4), it is far less evident that the interests of drug manufacturers "coincide - i.e., systematically, not fortuitously," *see Hazardous Waste Treatment Council, 885 F.2d 918, 924 (D.C. Cir. 1989)*, with the "best interests" of Medicaid recipients more generally.  Indeed, there is an inherent tension between the interests of beneficiaries and those who are supplying (for profit) the drugs being used.

Likewise, the Supreme Court noted that although "prior authorization may well have a **significant** impact on the manufacturers of brand name prescription drugs and that it will impose some administrative costs on physicians. The impact on manufacturers is not relevant because any transfer of business to less expensive products will produce savings for the Medicaid program."  *Walsh,* 538 U.S. at 668 (emphasis supplied).  But most importantly, the Supreme Court acknowledged that 42 U.S.C. § 1396a(a)(19) "also pursues arguably competing interests such as cost control, *see* § 1396a(a)(30), and affording States broad discretion to control access to prescription drugs." *Id*. at 676 (Scalia concurring) (citing *Thompson,* 259 F. Supp. 2d at 39).  As Medicaid funds are not unlimited, the Department has the job of administering the program in a way that utilizes its scarce resources effectively and responsibly while providing necessary health care services to Medicaid

21

members.  *See* [Dkt. 15-2 at 2].

### D.   CMS's Interpretation Is Entitled To Deference.

The Department's policy is consistent with CMS guidance and accordingly

it is not in violation of the Medicaid Act.  The Department is the single state

agency responsible for administering Georgia's Medicaid program.  *See* 42 C.F.R.

§ 431.10; O.C.G.A. § 49-4-140.  Pursuant thereto, the Department issues policies

and procedures governing the Medicaid program.  *See* 42 U.S.C. § 431.10(e)(1)(ii).

Likewise, the Secretary of the United States Department of Health and Human

Services has, in turn, delegated his or her authority to CMS as the federal agency

given the responsibility to administer the Medicaid program.  *See Douglass v.*

*Indep. Living Ctr. of So. Cal., Inc.*, 132 S. Ct. 1204, 1207 (2012); *Wisconsin Dep't*

*of Health & Family Servs. v. Blumer*, 534 U.S. 473, 479 (2002).

> The Social Security Act is among the most intricate ever drafted by
> Congress. Its Byzantine construction, as Judge Friendly has observed,
> makes the Act "almost unintelligible to the uninitiated." …Perhaps
> appreciating the complexity of what it had wrought, Congress
> conferred on the Secretary exceptionally broad authority to prescribe
> standards for applying certain sections of the Act.

*Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981) (quoting *Friedman v. Berger*,

547 F.2d 724, 727, n. 7 (2d Cir. 1976), *cert. denied*, 430 U.S. 984 (1977); citing

*Batterton v. Francis*, 432 U.S. 416, 425 (1977); interpreting eligibility

requirements of Medicaid).  As a participant in the Medicaid program, the State of

Georgia must abide by the requirements imposed by the Medicaid Act and the
Secretary. *See Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 502 (1990).

CMS has issued guidance to the states setting forth its interpretation of the
Medicaid Act in two statements, the statement issued on March 30, 2011 and June
15, 2012. [Dkt. 2-36; 2-42].  In the March 30, 2011 statement, CMS advised the
FDA will continue to allow compounding of 17P and

> Therefore, we would like States to be aware that they can choose to pay for
> the extemporaneously compounded hydroxyprogesterone caproate as an
> active pharmaceutical ingredient (API) and this can be covered under the
> "medical supplies, equipment and appliances suitable for use in the home"
> portion of home health.

[Dkt. 2-39].   In an updated statement of June 2012, it again advised "States may,
under appropriate circumstances, cover APIs as incident to another service
category or, as a pharmacy service, if such coverage is consistent with the State
plan." [Dkt. 2-42].  Similarly, Plaintiffs themselves concede the "CMS policy
permit[s] Medicaid program reimbursement of compounded products." [KV
Annual Report at 25].[7]  *See also* Goedeke Depo. at 214-15.

Not only are CMS' interpretations binding on state Medicaid agencies, they
are entitled to judicial deference. *See United States v. Larionoff,* 431 U.S. 864, 872

---

[7] Likewise, in Plaintiffs' lawsuit against the FDA, they "emphasize the prospective
nature of FDA's [March 2011] pronouncement and argue that since it addresses
future conduct, it constitutes 'an affirmative public invitation' to compound 17P."
*K-V Pharm. Co.,* 889 F. Supp. 2d at 134.

(1977); *Chevron, U.S.A. v. Natural Res. Def. Counsel, Inc.*, 467 U.S. 837, 844

(1984); *Georgia v. Shalala*, 8 F.3d 1565, 1566-68, 1571 (11th Cir. 1993).   That is,

if a "statute is ambiguous, and if the implementing agency's construction is

reasonable, *Chevron* requires a federal court to accept the agency's construction of

the statute, even if the agency's reading differs from what the court believes is the

best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X internet

Servs.*, 545 U.S. 967, 980 (2005).  Here, both the Department and CMS interpret

the statute the same way as the Department has discretion to prefer 17P so long as

it provides patients with access to Makena.  As Mr. Dubberly explained,

"Coverage means that there's a mechanism to access the product."  [Dubberly

Depo. at 160].  There is no dispute that the Department has approved requests for

Makena.  [Dkt. 14-4 at 4, 6].  As coverage is provided, there is no violation of the

Medicaid Act.

## V.   **CONCLUSION**

For the foregoing reasons, the Department respectfully requests that this

Court grant their Motion for Summary Judgment.

This 8th day of May, 2013.

Respectfully submitted,
SAMUEL S. OLENS          551540
Attorney General

DENNIS R. DUNN          234098
Deputy Attorney General
/s/SHALEN S. NELSON
SHALEN S. NELSON       636575
Senior Assistant Attorney General
/s/JASON S. NAUNAS
Georgia Bar No.             142051
Assistant Attorney General
/s/MICHELLE TOWNES
MICHELLE TOWNES       714924
Assistant Attorney General

PLEASE SEND ALL
COMMUNICATIONS TO:
JASON S. NAUNAS
MICHELLE TOWNES
Assistant Attorneys General
40 Capitol Square, S.W.
Atlanta, Georgia 30334-1300
Telephone: 404-656-3357
Facsimile: 404-463-1062
E-mail:jnaunas@law.ga.gov
E-mail: mtownes@law.ga.gov

## CERTIFICATION OF COMPLIANCE WITH RULE AND ORDER

I hereby certify that the forgoing Defendants' Memorandum Of Law In

Support Of Their Motion For Summary Judgment was prepared in 14-point Times

New Roman font in compliance with Local Rule 5.1(C).

/s/ Jason S. Naunas
JASON S. NAUNAS
Assistant Attorney General
Georgia Bar No. 142051